FILED
United States Court of Appeals
Tenth Circuit

November 12, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 07-3327

RAMIRO ALAPIZCO-
VALENZUELA,

Defendant - Appellant.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D. Ct. No. 07-CR-10023-01-WEB)**

---

Cyd Gilman, Assistant Federal Public Defender, Office of the Federal Public Defender, Wichita, Kansas, appearing for the Appellant.

Brent I. Anderson, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with him on the brief), Office of the United States Attorney, Wichita, Kansas, appearing for the Appellee.

---

Before **TACHA**, **HOLLOWAY**, and **HOLMES**, Circuit Judges.

---

**TACHA**, Circuit Judge.

---

Defendant-Appellant Ramiro Alapizco-Valenzuela pleaded guilty to one

count of transporting illegal aliens for private financial gain in violation of 8

U.S.C. § 1324(a)(1)(A)(ii). He appeals his seventy-two-month sentence. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and we AFFIRM.

## I. BACKGROUND

On January 24, 2007, a sheriff's deputy in Reno County, Kansas was dispatched to a location on U.S. Highway 50 to assist a stranded motorist in a white minivan. When the deputy arrived, he saw that the minivan had pulled over from the eastbound lane and had a flat tire. The deputy approached the minivan and initiated contact with the driver, Mr. Alapizco-Valenzuela's co-defendant Rene Cota-Beltran. Mr. Alapizco-Valenzuela was sitting in the front passenger seat. The deputy offered to help the two men change their tire and called for a tow truck to assist in the effort. The tow truck arrived, and the deputy opened the door at the rear of the minivan, where he discovered ten men and one woman crowded together as if trying to hide. Most were not wearing shoes and none of them had any money. Later investigation revealed that the occupants were not lawfully present in the United States.

Mr. Alapizco-Valenzuela was subsequently charged in a five-count indictment for conspiring to take hostages, in violation of 18 U.S.C. § 1203; aiding and abetting the taking of hostages, in violation of 18 U.S.C. § 1203 and 18 U.S.C. § 2; exporting aliens not lawfully in the United States for financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), (a)(1)(B)(i); conspiring to

export aliens not lawfully in the United States for financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), (a)(1)(A)(v)(I), (a)(1)(B)(i); and illegally reentering the United States after previously being deported, in violation of 8 U.S.C. § 1326(a). After entering into plea negotiations with the government, he pleaded guilty to the count of exporting aliens not lawfully in the United States for financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), (a)(1)(B)(i).

Following Mr. Alapizco-Valenzuela's guilty plea, the United States Probation Office prepared a presentence report ("PSR"). The PSR reported that agents with the Immigration and Customs Enforcement Bureau ("ICE") had interviewed Mr. Alapizco-Valenzuela, Mr. Cota-Beltran, and the aliens found in the back of the minivan. Although the aliens' stories varied slightly, the PSR stated that the interviews tended to show that the aliens had met with a smuggler in Mexico and paid him or agreed to pay him to help them enter the United States illegally and to transport them to Florida. After crossing the border, they were picked up in vehicles and transported to a "stash house" in Arizona. There, they were directed at gunpoint to turn over their money, their shoes, and other personal belongings. They were also threatened with physical harm and death if they did not call friends and family to secure additional money to pay the smugglers.

After the aliens had been detained for approximately half a day, armed Hispanic males entered the house, tied up the smugglers, and transported the aliens at gunpoint to another stash house, where the aliens were held captive for

-3-

the next three or four days. They were given minimal food and water and were forced at gunpoint, under threat of dismemberment and death, to call family and friends to request $2500. They were told they would need to pay $2000 before they would be released from the house and would need to pay the additional $500 to their driver upon their arrival in Florida. Otherwise, they were told, the driver would not release them.

At some point, Mr. Alapizco-Valenzuela arrived at the second stash house. Eleven aliens were loaded into the minivan, where they were instructed to lay flat on the floor. A man known as "Lobo" drove them—barefoot and without money or other belongings—from the second stash house, and Mr. Alapizco-Valenzuela rode in the front passenger seat. After about ten minutes, the minivan stopped and Mr. Cota-Beltran got in and replaced Lobo as the driver. The group continued on their way to Florida, with the aliens being forced to urinate in a plastic bottle because they were not permitted to leave the van. When the minivan's tire went flat in Kansas and the sheriff's deputy arrived, the aliens were instructed to tell law enforcement that the entire group was traveling together to find work and that they were all taking turns driving. They were told that things would be worse for them if they did not tell authorities this story.

After setting forth these facts, the PSR noted that the base offense level for transporting illegal aliens is twelve. *See* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 2L1.1(a)(3). The PSR then recommended several

increases for specific offense characteristics. First, the PSR added three levels because Mr. Alapizco-Valenzuela transported between six and twenty-four aliens. *See id.* § 2L1.1(b)(2)(A). Another three levels were added because Mr. Alapizco-Valenzuela overloaded the aliens into the minivan and transported them without safety restraints, thereby intentionally or recklessly subjecting the aliens to a substantial risk of death or bodily harm. *See id.* § 2L1.1(b)(6). Finally, the PSR recommended a two-level increase because an alien was involuntarily detained through coercion or threat, or in connection with a demand for payment. *See id.* § 2L1.1(b)(8).

The PSR then applied upward and downward adjustments under Chapter Three of the Guidelines. Specifically, the PSR recommended a two-level upward adjustment for obstructing justice based on the aliens' statement that they were threatened and intimidated when instructed to tell law enforcement officers they were all taking turns driving and looking for work together. *See id.* § 3C1.1. The PSR recommended a three-level downward adjustment for acceptance of responsibility based on Mr. Alapizco-Valenzuela's guilty plea. *See id.* § 3E1.1. This resulted in a total offense level of nineteen, which, in combination with Mr. Alapizco-Valenzuela's criminal history category I, yielded an advisory Guidelines range of thirty to thirty-seven months.

Mr. Alapizco-Valenzuela objected to the PSR's two-level increase for detaining an alien through coercion or in connection with a demand for payment

and to the PSR's two-level increase for obstructing justice by intimidating or threatening a witness. He denied being involved with the detention and extortion of the smuggled aliens, contended he never carried a firearm and never threatened anyone, and claimed he did not instruct the passengers to lie to law enforcement.

The government responded to Mr. Alapizco-Valenzuela's objections and further filed a "Motion for Upward Departure and Upward Variance." In the motion, the government argued that the circumstances of the case brought it outside the heartland of alien-smuggling offenses and therefore warranted a higher-than-Guidelines sentence under U.S.S.G. § 5K2.0. The government also contended that a higher sentence should be imposed in light of the factors set forth in 18 U.S.C. § 3553(a). The government advocated for an offense level of twenty-six, noting that this would bring it more in line with the offense of kidnaping for a ransom. *See* U.S.S.G. § 2A4.2. An offense level of twenty-six for a person with a criminal history category I produces a Guidelines range of sixty-three to seventy-eight months. The government sought a sentence at the top of this range.

The district court, both orally at sentencing and in a subsequent written order, denied the objections, granted the government's motion, and sentenced Mr. Alapizco-Valenzuela to seventy-two months. On appeal, Mr. Alapizco-Valenzuela challenges the application of the two-level enhancement under § 2L1.1(b)(8) for detaining an alien involuntarily through coercion or threat, or in

-6-

connection with a demand for payment. He also challenges the district court's decision to grant the motion for an upward departure and upward variance.

## II. DISCUSSION

A.  Standard of Review

   After *United States v. Booker*, 543 U.S. 220 (2005), we review sentences for reasonableness under a deferential abuse-of-discretion standard. *United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008). "Reasonableness review is a two-step process comprising a procedural and a substantive component." *United States v. Verdin-Garcia*, 516 F.3d 884, 895 (10th Cir. 2008) (citing *Gall v. United States*, — U.S. —, 128 S.Ct. 586, 597 (2007)). Procedural review asks whether the sentencing court committed any error in calculating or explaining the sentence. *See United States v. A.B.*, 529 F.3d 1275, 1278 (10th Cir. 2008). *See also Gall*, 128 S. Ct. at 597 (procedural errors include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence"). Substantive review "involves whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Conlan*, 500 F.3d 1167, 1169 (10th Cir. 2007).

   Accordingly, if the issue is raised on appeal, the first step in reviewing any

sentence is to determine whether the district court considered the applicable Guidelines range. *United States v. Shaw*, 471 F.3d 1136, 1140 (10th Cir. 2006); *United States v. Kristl*, 437 F.3d 1050, 1055 (10th Cir. 2006). In making this determination, we review the court's "legal conclusions de novo and its factual findings for clear error." *Kristl*, 437 F.3d at 1055. A non-harmless error in calculating the Guidelines range renders the sentence unreasonable and entitles the defendant to resentencing. *Id.*

Once we have determined that the district court considered the applicable Guidelines range, our next step is to consider whether the sentence is otherwise procedurally sound and whether the length of the chosen sentence is substantively reasonable. *Gall*, 128 S. Ct. at 597. As to the latter inquiry, it is clear after *Rita v. United States*, — U.S. —, 127 S. Ct. 2456 (2007), that a within-Guidelines sentence is entitled to a presumption of substantive reasonableness on appeal. *United States v. Sells*, 541 F.3d 1227, 1237 (10th Cir. 2008); *Kristl*, 437 F.3d at 1055. The defendant may rebut this presumption by showing that his sentence is unreasonable in light of the sentencing factors delineated in 18 U.S.C. § 3553(a). *Kristl*, 437 F.3d at 1055.

When the sentence imposed is higher or lower than what the Guidelines recommend, we engage in a different analysis to determine whether the sentence is substantively reasonable. This analysis hinges on the method by which the district court selects the particular sentence. When the district court uses

Chapters Four and Five of the Guidelines to depart from the advisory Guidelines range, *see United States v. Atencio*, 476 F.3d 1099, 1101 n.1 (10th Cir. 2007), we employ the same four-part test that we used prior to *Booker*. We ask:

> (1) whether the factual circumstances supporting a departure are permissible departure factors; (2) whether the departure factors relied upon by the district court remove the defendant from the applicable Guideline heartland thus warranting a departure; (3) whether the record sufficiently supports the factual basis underlying the departure; and (4) whether the degree of departure is reasonable.

*United States v. Munoz-Tello*, 531 F.3d 1174, 1186 (10th Cir. 2008); *United States v. Collins*, 122 F.3d 1297, 1303 (10th Cir. 1997). *See also United States v. Martinez-Barragan*, – F.3d –, 2008 WL 4632806, at *4 (10th Cir. 2008) ("[N]either *Booker* nor any of the subsequent cases have altered the standard for when to depart from the recommended range."). In considering these prongs, "we apply a unitary abuse of discretion standard."[1] *Munoz-Tello*, 531 F.3d at 1186 (quotations omitted). As a practical matter, however, this standard affords more deference to factual questions and less (if any) deference to legal ones:

> Although we apply a unitary abuse of discretion standard to these four prongs, we have specified that the degree of deference to the district court varies depending on the essential nature of the question presented on appeal. That is, if the question on appeal has the hue of a factual question, we accord the district court greater deference, whereas we undertake plenary review of questions that are in essence legal.

---

[1]This standard entails an abuse-of-discretion review of a sentencing court's determination of factual circumstances supporting a departure and the same "review to determine that the [court's] discretion was not guided by erroneous legal conclusions." *Koon v. United States*, 518 U.S. 81, 100 (1996).

*Id.* (quotations, citations, and alteration omitted).[2]

On the other hand, when the district court varies from the advisory Guidelines range through application of the § 3553(a) factors, *see Atencio*, 476 F.3d at 1101 n.1, we simply consider whether the length of the sentence is substantively reasonable utilizing the abuse-of-discretion standard. *See United States v. Munoz-Nava*, 524 F.3d 1137, 1146 (10th Cir. 2008). We do not apply a presumption of unreasonableness to the sentence, and instead "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance. The fact that [we] might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Id.*[3]

_____

[2]Although we have never so stated, this standard of review is similar to the standard we apply in determining whether the district court *first* arrived at the appropriate advisory Guidelines range. *See Kristl*, 437 F.3d at 1055 (in calculating the Guidelines range, we review the district court's "legal conclusions de novo and its factual findings for clear error"). In addition, the four-part test also contains what we have characterized, at least in other contexts, as both procedural and substantive components. For example, in analyzing a departure, we must ask whether the departure factor is a permissible one under the Guidelines. This is similar to asking whether the court committed a procedural error by basing a sentence on a factor not within those enumerated in § 3553(a). *See United States v. Smart*, 518 F.3d 800, 803 (10th Cir. 2008). Regarding the substantive component, considering the degree of the departure is analogous to considering the overall length of the sentence, and we have repeatedly explained that the latter consideration goes to the substantive reasonableness of the sentence. *See Conlan*, 500 F.3d at 1169.

[3]To be sure, at times we have offered a slightly different approach. Specifically, we have suggested that considering the Guidelines' departure

(continued...)

-10-

With these principles in mind, we turn to Mr. Alapizco-Valenzuela's

sentence.

B.   Application of Specific-Offense Enhancement Under U.S.S.G.

     § 2L1.1(b)(8)

We first address Mr. Alapizco-Valenzuela's contention that the facts of this

case do not support a two-level specific-offense enhancement under U.S.S.G.

§ 2L1.1(b)(8) for involuntarily detaining smuggled aliens through coercion or

threat, or in connection with a demand for payment.  *See Kristl*, 437 F.3d at 1055

("First, we must determine whether the district court considered the applicable

---

[3](...continued)
provisions is part of the district court's obligation to calculate the appropriate
Guidelines range, which is then considered in light of the § 3553(a) factors.  *See
United States v. Barragan*, – F.3d at –, 2008 WL 4632806, at *4 ("One step in
applying the Guidelines is to determine whether or not to depart from the range
specified in the Sentencing Table."); *A.B.*, 529 F.3d at 1286 (explaining that we
have relied on cases from other circuits "that could be read to require district
courts to consider available Guidelines departures as part of their initial
consultation of the Guidelines") (emphasis omitted); *United States v. Calzada-
Maravillas*, 443 F.3d 1301, 1305 (10th Cir. 2006) (noting that consideration of
the Guidelines "necessarily includes consideration of [the] departure provisions").
Other circuits, too, have articulated this view.  *See United States v. McBride*, 434
F.3d 470, 477 (6th Cir. 2006) ("Because Guideline 'departures' are a part of the
appropriate Guideline range calculation, we believe that Guideline departures are
still a relevant consideration for determining the appropriate Guideline sentence.
This Guideline sentence is then considered in the context of the section 3553(a)
factors."); *United States v. Haack*, 403 F.3d 997, 1003 (2d Cir. 2005) ("Once the
applicable range is determined, the court should then decide if a traditional
departure is appropriate under . . . the Federal Sentencing Guidelines. . . . Once
the guidelines sentence is determined, the court shall consider all other factors set
forth in § 3553(a) to determine whether to impose the sentence under the
guidelines or a non-guidelines sentence.").

Guidelines range.").  At sentencing, "the government has the burden of proving by a preponderance of the evidence any findings necessary to support a sentence enhancement."  *United States v. Gambino-Zavala*, 539 F.3d 1221, 1228 (10th Cir. 2008).  "In evaluating the application of a Guidelines enhancement, we review factual findings for clear error."  *United States v. Scott*, 529 F.3d 1290, 1300 (10th Cir. 2008) (quotations omitted).

The parties entered into a stipulation which permitted the government to submit investigative reports and interview transcripts in lieu of witness testimony at the sentencing hearing.  The government submitted eight memoranda of interviews that ICE agents conducted with seven of the aliens, and it submitted one memorandum of an interview agents conducted with the two defendants.  As the PSR noted, the aliens' responses in the interviews revealed that they had been forced at gunpoint to give up their personal belongings, to phone family members and friends for additional money to pay the smugglers, to remain hidden in the stash houses with little food or drink, and to lie crowded and cramped in the minivan en route to Florida with no means of escape.  Indeed, most of the aliens specifically stated that they did not feel free to leave the stash houses, and that they feared for their lives and physical safety.  Two aliens stated that they saw Mr. Alapizco-Valenzuela with a gun when he arrived at the second stash house; one of those two stated that Mr. Alapizco-Valenzuela was part of a group of gunmen who came to the second stash house and demanded each person pay

-12-

additional money or be shot.

For his part, Mr. Alapizco-Valenzuela also submitted a memorandum of an ICE interview with one of the transported aliens.  That alien reported that Mr. Alapizco-Valenzuela did not have a gun and that he did not threaten any members of the group directly.  Mr. Alapizco-Valenzuela also introduced the results of a polygraph he had taken, which suggested that he was being truthful when he stated that he never had a gun and never saw anyone with a gun at the second stash house.  Finally, Mr. Alapizco-Valenzuela submitted a letter from his girlfriend stating that criminal conduct was out of his character.

At the sentencing hearing, the court explained that it had considered the exhibits and heard the parties' argument on the § 2L1.1(b)(8) enhancement.  The court then ruled:

> Pursuant to the United States Sentencing Guideline 2L1.1(b)(8), if an alien was involuntarily detained through coercion or threat or in connection with a demand for payment after the alien was smuggled into the United States or while the alien was transported or harbored in the United States, you increase the offense level to two levels.
> The 11 illegal aliens were held against their will after entering into the United States, their shoes and personal belongings were taken and they were forced at gunpoint to call family or friends to collect money for their release.  After the money was obtained the aliens were ordered into the van, ordered to lay face down and they were transported.
> They were told they were—would have to pay an additional $500 to the drivers of the van to be released when they arrive [sic] at their destination.  They were not allowed to exit the van during the transport and were forced to relieve themselves in plastic bottles.  Passengers of the van said the defendant was at the stash house and

-13-

was seen with a firearm. One passenger stated this defendant was in the stash house but did not see a firearm.

My ruling, the passengers did not feel free to leave or escape, they were not allowed to exit the vehicle and they were going to have to pay the drivers of the vehicle before they would be released once they reached their final destination. The defendant's objection, therefore, is denied.

The court subsequently issued a written order that stated:

The passengers are consistent in their version of events. They were held at a house, probably in Phoenix, Arizona, where their shoes and personal belongings were taken. Their personal belongings were never returned, and when they were discovered outside Hutchinson, Kansas, they were not wearing shoes. At the second house, they were forced to call family or friends, at gunpoint, to request $2500.00 for their release. $2000.00 was paid before they left the house, with the other $500 to be paid to the driver when they arrived at their destination. They were told if the money was not paid, they would not be released. The men at the second house carried firearms, and two of the eleven passengers stated they saw the defendant with a firearm at the second house. The defendant admitted he was at the second house and drove the van from the residence. Seven of the passengers told law enforcement they felt they were not free to leave the house or the van. Inside the van, they had to urinate in a bottle, and were not allowed to exit the vehicle. They were told to stay down, and not look around. When law enforcement made contact with the passengers and the two defendants, the defendants told the passengers not to say anything and to tell law enforcement all of them were driving, and if they tell [sic] police what really happened, things would get worse for them. The statements from the passengers show this defendant participated in threatening the aliens. The court finds that these acts were committed personally by the defendant. The court also finds these acts committed by the co-defendant were reasonably foreseeable acts by others in furtherance of a jointly undertaken criminal activity. *See* U.S.S.G. § 1B1.3(1)(B).

In contesting the application of this enhancement on appeal, Mr. Alapizco-Valenzuela contends that the evidence does not show that he ever had a firearm.

Although there is some evidence that supports Mr. Alapizco-Valenzuela's version of events (specifically, the statement of one alien and the polygraph report), there is also evidence to the contrary: two aliens reported that they saw Mr. Alapizco-Valenzuela with a gun. The district court was free to determine the relative reliability of that evidence and to credit the statements of the aliens who told ICE agents that Mr. Alapizco-Valenzuela carried a firearm in support of the § 2L1.1(b)(8) enhancement. *See United States v. Sims*, 428 F.3d 945, 952–53 (10th Cir. 2005) (explaining that when there is conflicting evidence, "evaluation of the credibility of witnesses, the weight to be given the evidence, and inferences to be drawn from the evidence are for the district court") (alteration omitted).

Moreover, the district court did not apply the enhancement based solely on a finding that Mr. Alapizco-Valenzuela carried a firearm. Rather, the court emphasized that the totality of the circumstances—the aliens' being held at the stash houses, being ordered at gunpoint to contact family and friends for more money before they would be taken to Florida, being robbed of personal belongings and shoes to prevent escape, and not being permitted to leave the minivan en route to Florida—supported the legal conclusion that they were involuntarily detained through coercion or threat, or in connection with a demand for payment, and that those acts were personally committed by Mr. Alapizco-Valenzuela or reasonably foreseeable to him under U.S.S.G. § 1B1.3(a)(1)(A)–(B).

In addition, and contrary to Mr. Alapizco-Valenzuela's contentions, the

district court's finding that he participated in those acts or should have reasonably foreseen them are not clearly erroneous. *See United States v. Tagore*, 158 F.3d 1124, 1129 (10th Cir. 1998) ("We review the district court's factual findings . . . [including] [t]he district court's finding concerning forseeability . . . under a clearly erroneous standard.") (quotations and citations omitted). Viewed in the light most favorable to the district court's finding, *see United States v. Brown*, 314 F.3d 1216, 1221 (10th Cir. 2003), the evidence demonstrates that Mr. Alapizco-Valenzuela, armed with a firearm, arrived at the second stash house shortly before heading to Florida. The aliens detained there did not have shoes or any personal belongings, and several armed guards were keeping watch over them. A reasonable inference from these facts is that Mr. Alapizco-Valenzuela knew that the aliens were being held against their will when he participated in loading them into the minivan and setting off for Florida.

The district court also considered evidence that the aliens were instructed to stay down and lay flat in the van and were not allowed to leave the vehicle—even to use the restroom—and that they were told they would be required to pay the driver $500 when they arrived at their destination. As a passenger in the van, Mr. Alapizco-Valenzuela participated in those coercive acts. All of this amply supports the district court's finding that Mr. Alapizco-Valenzuela joined in involuntarily detaining the aliens through coercion or threat, or in connection with a demand for payment. This finding is sufficient to support the § 2L1.1(b)(8)

enhancement.

Finally, Mr. Alapizco-Valenzuela argues that he is entitled to resentencing because the district court did not comply with Rule 32 of the Federal Rules of Criminal Procedure in imposing the enhancement. Under that Rule, a district court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing[.]" Fed. R. Crim. P. 32(i)(3)(B). "If the district court fails to comply with Rule 32[(i)(3)(B)], we must remand for the court to either make the necessary findings . . . or enter a declaration that it did not take the controverted matters into account in sentencing the defendant." *United States v. Cereceres-Zavala*, 499 F.3d 1211, 1213–14 (10th Cir. 2007).

Here, Mr. Alapizco-Valenzuela objected to paragraph 33 of the PSR, which recommended the two-level enhancement under § 2L1.1(b)(8). In that objection, he denied being involved with the detention and extortion of the aliens, denied seeing anyone else in possession of a firearm, and argued that he allowed the aliens to stop to use the restroom as he drove them to Florida. Contrary to Mr. Alapizco-Valenzuela's assertion, the district court ruled on these factual disputes. In its written order denying his objection to the enhancement, the district court expressed its agreement with the aliens' version of events, including their detention at both stash houses and inside the minivan. The court recited evidence

-17-

supporting a finding that he had a firearm at the second house, and it agreed with the aliens' statements that he directly participated in threatening them. In ruling on these disputed issues, the court thus complied with Rule 32.

C.    Departure or Variance

Given that we apply a different appellate framework depending on whether the sentence is the result of a departure or a variance, our review of Mr. Alapizco-Valenzuela's sentence requires that we first determine whether the district court departed upward, varied upward, or both departed and varied upward when it granted the government's "Motion for Upward Departure and Upward Variance." Although this is a close question, our review of the entire record convinces us that the sentence is a variance.

In its motion, the government first set forth the factual background of the crime, which does not differ in significant respects from the facts we have already relayed. The government then advocated for an upward departure under U.S.S.G. § 5K2.0, which provides that the sentencing court may depart from the applicable Guidelines range if there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The government argued that the two-level enhancement under § 2L1.1(b)(8) contemplates "an isolated, minor detention of limited duration as opposed to the four-day ordeal involving, in effect, multiple detentions amounting to kidnaping, plus other inhumane treatment," and that the

-18-

circumstances of this case are thus of a kind and to a degree not adequately taken into consideration by the Sentencing Commission. In the alternative, the government argued for an upward variance. It explained that the egregious facts necessitated a higher sentence in order to adequately deter future conduct and to constitute just punishment, *see* 18 U.S.C. § 3553(a)(2)(A), (a)(2)(B), and that the other § 3553(a) factors similarly counseled in favor of an above-Guidelines sentence. The government sought an increase in Mr. Alapizco-Valenzuela's offense level from nineteen to twenty-six, which would bring his sentence more in line with a sentence for kidnaping and demanding a ransom. *See* U.S.S.G. §§ 2A4.1, 2A4.2. The resulting sentencing range was sixty-three to seventy-eight months.

At the sentencing hearing, the district court referred to the motion both in terms of a departure and a variance. At one point, the court appeared to conflate the two types of sentences, calling the motion one for an "upward departure variance" and noting that "[a]fter considering the factors set forth in 18 U.S.C. § 3553(a), the Court finds that the facts of this case constitute aggravating circumstances and that this case falls outside the [heartland] of the immigration cases."[4] We are not bound, however, by the district court's characterization of the

---

[4]The district court's language is not surprising. Although "[d]epartures and variances are analytically distinct, and courts must be careful not to confuse them," it is also clear that "[b]ecause many of the same considerations are part of both the departure and variance analyses, there will, necessarily, be some overlap
(continued...)

motion and resulting sentence—at least where, as here, the court's characterization

is inconsistent and ambiguous.  A full reading of the district court's explanation at

sentencing clarifies that the court imposed a sentence based primarily on the

§ 3553(a) factors and was therefore varying from the Guidelines:

> The facts of the case show that the illegal aliens were held at gunpoint, forced to call family or friends at gunpoint to request money, their shoes and personal belongings were taken, they were fed very little, they were transported and made to urinate in plastic jugs, as they were not allowed to exit the vehicle.  When they were made [sic] contact with law enforcement they were threatened and told to lie to the officers.
> The Court relies on the following factors: One, the nature and circumstance of the [offense] [18 U.S.C. § 3553(a)(1)], the case falls outside the [heartland] of immigration cases in the unlawful restraint and extreme conduct by the defendant and others involved in criminal organization.  The victims in this case were held captive for a number of days, forced to extort money from their family and friends at gunpoint.  The seriousness of the offense [18 U.S.C. § 3553(a)(2)(A)], the  defendants participated in holding 11 people hostage, extorting money and then not providing safe means of transportation for the passengers in the vehicle.
> The question of adequate deterrence [18 U.S.C. § 3553(a)(2)(B)], the Court finds that the sentence of 72 months will deter this type of conduct.  As for the protection to the public [18 U.S.C. § 3553(a)(2)(C)], the public will be protected from defendant while he's incarcerated.  Defendants participated in an illegal alien smuggling group and harm from this group is ongoing.  Also, the defendant admitted to law enforcement that he had participated in [] smuggling an alien in March, 2004.  The Court grants the motion for an upward departure and for an upward variance.  That's the ruling and judgment of the Court.

The district court's written order similarly supports our conclusion that the

---

[4](...continued)
between the two, when a [party] seeks, and the courts consequently are called upon to consider, both forms of [sentences]." *Martinez-Barragan*, – F.3d at –, 2008 WL 4632806, at *5.

sentence is a variance. Although the court initially characterized the sentence in

terms of a departure,[5] the court went on to set forth all of the § 3553(a) factors:

> The court, in determining the particular sentence to be imposed, shall consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

The court then applied those factors to the facts of the case, describing the

seriousness of holding eleven people hostage and causing them to fear for their

lives; noting that a higher sentence would more effectively deter similar criminal

conduct; explaining that a sentence of imprisonment would best protect the public

from Mr. Alapizco-Valenzuela, who had admitted to previously smuggling aliens

in 2004; and justifying the disparity between Mr. Alapizco-Valenzuela's sentence

and that of Mr. Cota-Beltran. In doing so, the court did not specifically refer to

---

[5] "The sentencing court may depart from the applicable guideline range if the court finds there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), and should result in a sentence different from that described. U.S.S.G. § 5K2.0."

the sentence as a variance (indeed, on occasion it called it a departure), but, as we have stated, we need not rely solely on the district court's isolated use of the terms "variance" or "departure" when the court's language is ambiguous and our reading of the entire record suggests a contrary conclusion. Here, where the court carefully enumerated all of the sentencing factors in § 3553(a), and then went on to emphasize that those factors justified a higher-than-Guidelines sentence, we conclude that the resulting sentence is a variance.

D.    Reasonableness

Mr. Alapizco-Valenzuela contends that his sentence is unreasonable because (1) the district court did not consider the § 3553(a) factors in imposing the sentence; (2) the district court used the same facts that supported the § 2L1.1(b)(8) enhancement to justify the upward variance; and (3) his co-defendant, Mr.Cota-Beltran, received a lower sentence.

Regarding the first objection, which goes to the procedural reasonableness of the sentence, *see Gall*, 128 S. Ct. at 597, it is clear that the district court properly considered the § 3553(a) factors. The court listed each factor individually, then explained the circumstances of the case relevant to the factors and supportive of a higher sentence. To the extent Mr. Alapizco-Valenzuela contends that the district court did not consider evidence of his good character under 18 U.S.C. § 3553(a)(1), we disagree. The court specifically noted that it must take into account the history and characteristics of the defendant under 18

U.S.C. § 3553(a)(1).  We do not find persuasive Mr. Alapizco-Valenzuela's contention that despite this explicit reference, "we have no way of knowing" whether the district court did indeed consider this factor.

Mr. Alapizco-Valenzuela also argues that the district court erred in using the same facts that supported the § 2L1.1(b)(8) enhancement to justify the upward variance.  Because he did not make this procedural challenge below, we review it only for plain error.  *See United States v. Lopez-Flores*, 444 F.3d 1218, 1221 (10th Cir. 2006).  "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Id.* (quotations omitted).  We conclude there is no error.

In the time since briefing was completed in this case, we have twice held that district courts have broad discretion to consider particular facts in fashioning a sentence under 18 U.S.C. § 3553(a), even when those facts are already accounted for in the advisory Guidelines range.  *See United States v. Jarvi*, 537 F.3d 1256, 1263 (10th Cir. 2008); *United States v. Huckins*, 529 F.3d 1312, 1319 (10th Cir. 2008).  Accordingly, a district court does not commit procedural error when it relies on the same facts to support both an enhancement and a variance, so long as it "articulate[s] specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the guidelines calculation."  *See Atencio*, 476 F.3d at 1107.  This explanation "need not be overly detailed."  *Id.* at

-23-

1106.

The district court adequately explained its reasons in this case. In its sentencing order, it reiterated the government's assertion that § 2L1.1(b)(8) contemplates an isolated, minor detention of limited duration. Referencing the § 3553(a) factors, the court then noted that in the case at hand, the victims were subjected to a four-day-long hostage situation in which they were essentially kidnaped at gunpoint, robbed of their personal belongings, held captive even after they paid a substantial sum of money, and prevented from leaving a vehicle during transport. The court distinguished these activities from those contemplated by the Sentencing Commission under § 2L1.1(b)(8). We find this to be a sufficient explanation. Accordingly, the district court did not err. *Cf. Huckins*, 529 F.3d at 1320 (a district court does not abuse its discretion in imposing a downward variance based in part on the defendant's lack of criminal history so long as it appropriately justifies the variance in light of the § 3553(a) factors).

Finally, Mr. Alapizco-Valenzuela argues his sentence is substantively unreasonable given the disparity between his sentence and that given to Mr. Cota-Beltran.[6] Disparate sentences, however, are permissible when the disparity is explicable by the facts of the particular case. *United States v. Haley*, 529 F.3d 1308, 1312 (2008). Here, the district court found Mr. Alapizco-Valenzuela more culpable than his co-defendant because Mr. Alapizco-Valenzuela was present at

---

[6]The record does not indicate the sentence Mr. Cota-Beltran received.

the second stash house, and therefore was more aware of the aliens' plight, whereas Mr. Cota-Beltran's involvement began later when he was picked up by the minivan en route to Florida. Mr. Alapizco-Valenzuela reiterates his argument that he did not have a firearm, did not see anyone else with a firearm, and did not participate in or know what had occurred at the stash houses. As we held, however, the district court's finding to the contrary is not clearly erroneous. Thus, the disparity is explicable on the facts and does not render Mr. Alapizco-Valenzuela's sentence substantively unreasonable.

### III. CONCLUSION

The district court did not rely on clearly erroneous facts in applying the two-level enhancement under U.S.S.G. § 2L1.1(b)(8), and the enhancement is warranted on those facts. Mr. Alapizco-Valenzuela's sentence is otherwise procedurally reasonable, and we reject his sole challenge to its substantive unreasonableness. Accordingly, we AFFIRM his sentence.