**UNITED STATES COURT OF APPEALS**

**TENCH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

TIMOTHY L. WYRICK,

    Defendant - Appellant.

No. 10-3117
(D.C. No. 2:09-CR-20131-JWL-1)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Chief Circuit Judge, **TACHA**, and **O'BRIEN**, Circuit Judges.

Timothy L. Wyrick appeals from the district court's imposition of a 37-month

sentence arising from his guilty plea to five counts of making threatening telephone calls

in interstate commerce. He claims his sentence is substantively unreasonable given his

---

[*] The parties have waived oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). This case is submitted for decision on the briefs.

This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id.*

"true first offender" status[1] and mental illness.  We disagree and affirm.

## I.  FACTUAL BACKGROUND

In 2005, Wyrick began working as a motorist assist technician[2] with the Kansas Highway Patrol (KHP).  In mid-March 2009, he began a six-month campaign of making more than sixty harassing and threatening telephone calls to KHP Trooper Kristie Gatlin.  During some of these calls, he either hung up before the call went to voicemail or let the call go to voicemail but did not leave a message or left an inaudible message.  However, in a great number of these calls, he left messages on Gatlin's voicemail telling her he was watching her and stating facts indicating he knew her whereabouts and activities.  Seven of the telephone calls were particularly egregious:

> (1) May 26:
>
> Hello, Kristie.  I know you have a gold police car.  I have fixed the brakes for you.  Hello, Kristie.  Letting you know I'm still watching you.  I know you had contact with the [Kansas Bureau of Investigation].

(R. Vol. 3 at 8.)

> (2) June 22:
>
> What are you doing?  Yes, I see you moved your cattle.  How come you took your flag down?  The gun you're carrying ain't going to help you off duty.  Well, still watching you.

(*Id.*)

---

[1] A "true first offender" refers to a defendant who has had no previous contact with law enforcement or the judicial system.  *See infra* at 12-13.

[2] Motorist assist technicians provide traffic control at crash scenes; they also assist motorists who experience problems with their vehicles.  They are not certified law enforcement officers.  (R. Vol. 2 at 48.)

(3) August 7:

Hello, Kristie! I got two things I'm gonna do to ya. I'm gonna flip a coin, see which one I do to ya first. Well I flipped a coin, I betcha you'd like to know how that turned out. Bye! I'm still watchin' ya!

(*Id.* at 11.)

(4) August 10 (Gatlin was under surveillance by two troopers when she received the following message):

Hey, Kristie! You oughta tell them two guys in that pick up that they need to do a better job. Heck, that ain't a very good stake out, you can see 'em. Golly! Hey, I wanna ask ya, you ever been shot by a gun? Been stabbed by a knife? Well, it might happen! I'd watch my back if I was you. I got a lot of guns watchin' you.

(*Id.* at 12.)

(5) August 20:

Hey, Kristie! How ya doin'? Well, it's almost gonna be payment day before too long. From what I can see on your bankin' account here, ya probably get paid tomorrow. Well, if you don't mind, I'll borrow some of your money out. Oh, and uh, tell your mom, see how she likes being a court clerk. See, ain't her birthday December, uh, 17th? And, yours is, uh, December 1st? Well, I know everybody's social security numbers and bank account numbers. See you later.

(*Id.* at 13.)

(6) September 4:

Hey, Trooper Gatlin! You got to leave too early from your traffic stop cause I already had my rifle all set. Had ya in the scope! Well, gonna be some good things happen tonight. Oh, I got your burial site all done, ready for you. Bye. Bye.

(*Id.* at 15.)

(7) September 9:

Hello, Kristie! How you doin'? Hey, you might want to tell them guys I see every day down here watchin' ya they're gonna have to do a better job than

- 3 -

that, cause I see 'em.  And I'm not afraid to take one of 'em out because they're nobody to me.  You may wanna protect 'em and be cautious of their statements because somethin' maybe happen to them!  Bye, bye now!

(*Id.* at 16.)

Wyrick was arrested on September 15; one of the telephones used to make some of the telephone calls was found in his boot.  In a post-arrest interview, he admitted to making some of the telephone calls.

## II. PROCEDURAL BACKGROUND

Wyrick was indicted on five counts of transmitting in interstate commerce a telephone call and voice mail message containing threats to injure the person of another in violation of 18 U.S.C. § 875(c).  The counts in the indictment related to the calls made on May 26 (Count 1), June 22 (Count 2), August 7 (Count 3), August 10 (Count 4) and September 4 (Count 5).  He was released on bond pending trial.  He eventually pled guilty to the indictment without the benefit of a plea agreement.

A presentence report (PSR) was prepared.  The probation officer determined the base offense level was 12.  *See* USSG §2A6.1(a).  She recommended a two-level enhancement to the base offense level because the offense involved more than two threats.  *See* USSG §2A6.1(b)(2)(A).  She also recommended a four-level enhancement because the offense resulted in a "substantial disruption of public, governmental, or business functions or services."[3]  *See* USSG §2A6.1(b)(4)(A).  Although Wyrick pled

_____

[3] On May 1, 2009, Gatlin reported the telephone calls to the Miami County, Kansas, Sheriff's Department.   In July 2009, the KHP took over the investigation because the Sheriff's Department had failed to identify a suspect.  On August 6, 2009, KHP Lieutenant Thomas Catania organized a five-member surveillance team to watch for

guilty, she did not recommend a downward adjustment for acceptance of responsibility due to his denial of responsibility after he pled guilty.[4] Therefore, she determined the total offense level was 18.

Because Wyrick had no juvenile adjudications, adult criminal convictions, arrests or other criminal conduct, the PSR concluded his Criminal History Category was I. Based on a total offense level of 18 and a Criminal History Category of I, the advisory guideline range was 27 to 33 months imprisonment. The probation officer recommended, however, that the court depart upward from the advisory guideline range under USSG §5K2.0(a) due to the following aggravating circumstances: (1) the "unusually egregious" nature of Wyrick's conduct; (2) Wyrick "used his position as a motor[ist] assist technician to commit the crime and to evade detection"; and (3) the offenses involved over sixty threatening communications and took place over a period of six months. (R. Vol. 3 at 27-28.)

Wyrick objected to the PSR and filed a sentencing memorandum. He said he was entitled to a downward adjustment for acceptance of responsibility, blaming any

persons who might be following Gatlin. In mid-August 2009, the KHP asked for assistance from the Federal Bureau of Investigation. In the end, the KHP spent over $47,000 on the investigation.

[4] Wyrick was fired by the KHP after his arrest. He later filed for unemployment benefits, which were denied. He appealed to the Kansas Department of Labor. At a hearing before a Department of Labor judge, Wyrick falsely testified under oath that he did not directly make threatening telephone calls to Gatlin and did not leave a threatening message on her telephone on September 15, 2009. He also falsely claimed he had complained to his supervisor about being sexually harassed (presumably by Gatlin) at work.

difficulty he has had in accepting the wrongfulness of his actions on his diagnosed mental condition of Delusional Disorder, Persecutory and Erotomania Types.[5]  He also argued the four-level enhancement under USSG §2A6.1(b)(4)(A) (substantial disruption) was unwarranted under the facts of the case.  He not only objected to the probation officer's recommendation for an upward departure but requested a downward variance from the advisory guideline range based on his Delusional Disorder and his status as a "true first offender."  He requested the court "sentence him to a term of probation with special conditions that include mental health counseling."  (R. Vol. 1 at 71.)

The government filed a sentencing memorandum agreeing with the probation officer's guideline calculations and its recommendation for an upward departure under USSG §5K2.0(a)(1).  It recommended Wyrick receive the statutory maximum sentence of 60 months imprisonment "[g]iven [his] six month campaign of terror . . . against Trooper Gatlin, which also involved her family and investigating officers . . . ." (R. Vol. 1 at 42.)

Several witnesses testified at the sentencing hearing.  Relevant here, Wyrick called Dr. Gregory Sisk, the clinical psychologist who diagnosed his Delusional Disorder.  Sisk opined Wyrick was a "low risk" to the community because he did not demonstrate many of the factors used to predict violence in stalkers—Wyrick had no history of substance abuse or previous violence against persons or things; he had not been treated for any kind

---

[5] Persons suffering from Delusional Disorder-Persecutory Type believe other individuals are maligning, slandering or mistreating them; individuals suffering from Delusional Disorder-Erotomania Type believe another person, usually someone of a higher social status, is in love with them.

of mental illness; he did not possess weapons; he had never violated a protection order or taken a hostage; he did not have suicidal tendencies; and he did not appear to be jealous or possessive of Gatlin. (R. Vol. 2 at 187.) The only risk factors Sisk identified were that Wyrick's communications with Gatlin involved "four or five" threats to kill and he was "somewhat obsessed" with her. (*Id.* at 186.) In part due to his behavior on bond, *i.e.*, his compliance with all of his bond conditions, including his having no contact with Gatlin, Sisk did not believe Wyrick would reoffend. Sisk did think Wyrick would benefit from treatment for his Delusional Disorder as well as training to enhance his social skills.

On cross examination, Sisk admitted it was "possible" the risk to the community could be elevated where, as here, the stalking involved threats to multiple victims, *i.e.*, Gatlin, her family, and the investigating officers. (*Id.* at 196.) But he said the research only focused on the risk of violence to the object of the delusion, in this case, Gatlin. Of the more than sixty calls Wyrick made to Gatlin, Sisk characterized only five as "threatening." (*Id.* at 219.) While admitting that the number of threats to kill Gatlin could be relevant, the number of threats in this case did not change his assessment of Wyrick's risk to the community. And that risk assessment came in spite of his acknowledgment that between twenty-one and twenty-five percent of stalking cases result in some type of violence, with two percent of them resulting in the stalker killing the victim. He described these percentages as "low." (*Id.* at 214.)

The district court sustained Wyrick's objection to the four-level enhancement under USSG §2A6.1(b)(4)(A). While it was a "close call," the court did "not believe that the disruption which occurred here was the kind of disruption the guidelines envisioned

- 7 -

when [USSG §2A6.1(b)(4)(A)] was adopted." (*Id.* at 280.)  Otherwise, the court

reasoned, the enhancement would apply any time there is a substantial investigation.  The

court overruled Wyrick's objection to the probation officer's failure to recommend a

downward adjustment for acceptance of responsibility, concluding "Wyrick's testimony

to the Kansas Department of Labor judge was purposefully untruthful and represented a

denial by him of the full and complete responsibility that . . . to this day he has not truly

accepted." (*Id.* at 282.)

Although the court recognized its authority to depart or vary downward, it

declined to do so based on either Wyrick's "true first offender" status or his suffering

from a delusional disorder.  It reasoned:

> Although Mr. Wyrick has no reported previous contacts with law
> enforcement, I also do not regard him as the sort of, quote, true first
> offender, end quote, for whom the Criminal History Category [I]
> overrepresents his culpability or his risk of recidivism.  The duration and
> severity of his activities here belie that. . . .
>
> As to his mental condition, I agree with Dr. Sisk that Mr. Wyrick is in need
> of treatment, whatever the technical diagnosis.  His behavior was
> reprehensible and bizarre, and if he truly can come to understand that and to
> see the world in a different way, perhaps he will not be a significant threat
> to repeat this conduct either as to Trooper Gatlin or as to someone else who
> might become the focus of his erotomania.
>
> As I reflect on Dr. Sisk's testimony, I am drawn to the conclusion that even
> if it were true that the need for . . . just punishment . . . is lower for
> someone like Mr. Wyrick because of a mental defect, the need to protect
> the public from his crimes is in some respects greater.  He did not suffer
> from some of the other problems that we often see with offenders, such as
> the lack of employment skills or substance abuse, but that is a two-edged
> sword.  A person who lacks employment skills or has had a substance abuse
> problem can accept responsibility, address those issues, receive training and
> treatment, and be on the path to rehabilitation.

Here Mr. Wyrick has shown only the most cursory remorse, the [apology] letter to Trooper Gatlin, and has continually minimized his culpability for an offense which terrorized a coworker and disrupted the activities of his employer, whose job it is to protect the public.

Interestingly enough, while Mr. Wyrick had interviews with Dr. Sisk to prepare an expert report and for expert testimony at trial, Mr. Wyrick has not sought out any treatment, notwithstanding that he has been at liberty and available to do so. He understands the difference between right and wrong . . . he does not suffer from uncontrollable impulses; he simply engaged in behavior that may have been rooted in a psychological disorder but which was no less serious as a result and is no less likely to happen again unless he decides that it is worth it to him to address seriously whatever issues he may have. And as one of the [18 U.S.C. §] 3553 factors elaborates, the opportunity for [treatment] will be available to him as a result of his incarceration.

(*Id.* at 283-85.)

The court did not credit Sisk's opinion that Wyrick was a low risk to the

community:

I did not find [Sisk's] balancing of risk factors to be persuasive, especially upon cross examination by the government. The prolonged threats, especially in the face of knowing an investigation was in progress, the violent nature of many of those threats, and his irrational view of himself as a victim all undercut the reasons set forth by Dr. Sisk; thus, I see Mr. Wyrick as not only a threat to recidivate as to harassing behavior but also a risk to escalate that behavior to actual violence . . . .

(*Id.* at 285.)

In the end, the court determined a five-level upward departure under USSG §5K2.0(a) was appropriate: (1) two levels for the number of calls and the duration of the offense conduct; (2) one level for the fact Wyrick used his employment position to facilitate the calls, (3) one level for the "horrific" nature of the telephone calls which included threats to kill and led Gatlin to believe Wyrick was constantly watching her, and (4) one level for his willful conduct in disrupting the Kansas Highway Patrol's ordinary activities.[6] **(***Id.* at 287.)** It concluded such enhancement "would be

---

[6] After the court imposed sentence, defense counsel asked for clarification as to

- 9 -

sufficient but not greater than necessary to carry out Congress' objectives for sentencing embodied in the [18 U.S.C. §] 3553 factors."[7] (R. Vol. 2 at 288.)

After factoring in the upward departure, the total offense level was 19, which, with a Criminal History Category of I, resulted in an advisory guideline range of 30 to 37 months imprisonment. The court concluded a sentence at the high end of that range was appropriate and sentenced Wyrick to 37 months imprisonment. Reflecting its consideration of the § 3553 factors, it said:

> Mr. Wyrick's conduct was very serious, albeit he did not actually assault Trooper Gatlin or worse, but I do not believe that she will soon get over the mental anguish inflicted; moreover, her family and her coworkers were all adversely affected by his activity. Thus, this sentence would reflect the seriousness of the offense.

---

whether the sentence increase was a departure or a variance. The court said it believed it qualified as a departure but even if it was incorrect, it believed it was an appropriate variance.

A departure occurs "when a court reaches a sentence above or below the recommended Guidelines range through application of Chapters Four or Five of the Sentencing Guidelines." *United States v. Atencio*, 476 F.3d 1099, 1101, n.1 (10th Cir. 2007), *overruled in part on other grounds by Irizarry v. United States*, 553 U.S. 708 (2008). A variance occurs "[w]hen a court enhances or detracts from the recommended range through application of § 3553(a) factors." *Id.* The proper terminology for the district court's sentencing increase is irrelevant to this appeal.

[7] These factors include:

(1) [the] offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) just punishment (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities [between defendants]; and (7) the need for restitution.

*Rita v. United States*, 551 U.S. 338, 347-348 (2007) (quotations omitted) (discussing 18 U.S.C. § 3553(a)(1)-(7)).

The need for just punishment calls out for a substantial imprisonment sentence. To the extent that Mr. Wyrick's mental condition is a mitigating factor, that is somewhat offset by the availability of treatment for him in the prison system, and this sentence would constitute just punishment.

Others should be deterred from such behavior. These were not just childish prank calls; they had consequences for the victims and others, and those people who might be inclined to do such calls or engage in such activity should realize that there are serious consequences for one who does engage in such activity.

I have previously observed that I believe the public needs protection from Mr. Wyrick and a 37-month sentence will do so by incapacitating him for a substantial period of time, during which treatment will be available and he will have the opportunity to come to grips with and overcome whatever led to this offense behavior.

(R. Vol. 2 at 289-90.)

### III. STANDARD OF REVIEW

"After *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), we review sentences for reasonableness . . . ." *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1214 (10th Cir. 2008). Reasonableness review consists of both a procedural and a substantive component. *Id.* "The procedural component focuses on the manner in which the sentence was calculated, and the substantive component concerns the length of the sentence actually imposed." *United States v. Masek*, 588 F.3d 1283, 1290 (10th Cir. 2009) (quotations omitted). Wyrick does not dispute the procedural reasonableness of his sentence. He only claims his 37-month sentence is substantively unreasonable because it failed to accommodate his status as a "true first offender" and his delusional disorder.

"We review sentences for substantive reasonableness under an abuse-of-discretion standard." *United States v. Middagh*, 594 F.3d 1291, 1294 (10th Cir. 2010). "A district

- 11 -

court abuses its discretion when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Muñoz-Nava*, 524 F.3d 1137, 1146 (10th Cir. 2008) (quotations omitted). We must determine "whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)."[8] *Alapizco-Valenzuela*, 546 F.3d at 1215 (quotations omitted).

## IV. DISCUSSION

In May 2004, the United States Sentencing Commission released a study entitled "Recidivism and the 'First Offender.'"[9] That study showed that recidivism rates differ among defendants who are assigned to Criminal History Category I. For instance, the study showed that defendants who had one criminal history point were almost twice as likely to reoffend as those with no criminal history points, even though both sets of defendants would fall within Criminal History Category I. *See* United States Sentencing Commission, *Recidivism and the "First Offender"* (May 2004) at 13. It also revealed a significant difference in recidivism rates among Category I offenders with no criminal

---

[8] The government argues that because the district court correctly calculated the guideline range and imposed a sentence within that range, Wyrick's sentence is entitled to a presumption of reasonableness. That is incorrect. Wyrick's sentence included a five-level upward departure (or variance) from the advisory guideline range. Therefore, the presumption of reasonableness does not apply. *See United States v. Alvarez-Bernabe*, 626 F.3d 1161, 1165 (10th Cir. 2010) ("A sentence imposed *within the properly calculated advisory guideline range* is entitled to a rebuttable presumption of reasonableness.") (emphasis added). However, a sentence outside the guideline range is not to be presumed to be unreasonable. *Gall v. United States*, 552 U.S. 38, 51 (2007).

[9] This study can be found at http://www.ussc.gov/Research/Research_Publications/publications.cfm.

history points—offenders with no prior arrests have a recidivism rate of 6.8% whereas offenders with prior arrests but no prior convictions have a recidivism rate of 17.2%. *Id.* at 16-17. The study concluded:

> From both culpability and recidivism risk perspectives, . . . offenders[] with no prior arrests, most strongly meet the conceptual definition of the first offender category. [These] [o]ffenders have had no recorded contact with the criminal justice system prior to their instant federal offense. Moreover, as indicated by their extremely low recidivism rate of 6.8 percent, they are easily the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend.

*Id.* at 17.

Relying on this study, Wyrick argues the district court should have varied downward from the advisory guideline range due to his "true first offender" status. He says his "complete lack of prior contact with the law distinguishes him even from other defendants in criminal history category I, and projects a very low risk of recidivism. This differential in recidivism rates is not adequately captured in the Sentencing Guidelines, and provides a[] separate rationale for a downward variance." (Appellant's Br. at 10.) He claims his behavior while on bond supports the research that as a "true first offender" he is unlikely to reoffend.

Wyrick also argues the court should have considered his mental illness a mitigating circumstance requiring a downward variance. While his delusional disorder did not render him unable to differentiate between right and wrong, he says it was the "driving force behind his bizarre and irrational behavior" and "clearly decreased [his] culpability." (Appellant's Br. at 21.) Wyrick also contends the district court erred in justifying the length of the sentence on his ability to obtain treatment while in prison. He

says his behavior on pretrial release demonstrates he could be treated successfully while under supervision in the community. Therefore, he contends, the court's use of treatment as a justification for the imposition of a lengthy prison sentence runs contrary to 28 U.S.C. § 994(k), which states it is inappropriate to impose a prison sentence for purposes of rehabilitating the defendant or providing the defendant with needed correctional treatment.

We see no abuse of discretion and conclude Wyrick's sentence is patently reasonable. The district court considered Wyrick's argument that he was entitled to a lower sentence due to his being a "true first offender." However, it determined the duration and severity of Wyrick's conduct belied any notion that he was a "true first offender." It also was not convinced (and reasonably so) that Wyrick was unlikely to reoffend merely because he did not have any previous contact with law enforcement. The court noted Wyrick (1) had continued his harassing behavior despite knowing he was under investigation, (2) had shown only the most cursory remorse, and (3) continued to minimize his culpability for the offense. It also pointed out that although Wyrick sought Sisk's assistance for purposes of preparing an expert report for trial, he had utterly failed to seek any treatment for his delusional disorder while released on bond. His failure to address his delusional disorder, the alleged cause of his offensive behavior, weighs against any argument that he is unlikely to reoffend. Finally, the court did not credit Sisk's opinion that Wyrick was not a threat for violence concluding "his balancing of risk factors [was not] persuasive . . . . I see Mr. Wyrick as not only a threat to recidivate as to harassing behavior but also a risk to escalate that behavior to actual violence." (R. Vol. 2

- 14 -

at 285.)  That was the court's prerogative.  *See United States v. Munoz-Tello*, 531 F.3d 1174, 1182 (10th Cir. 2008) (stating we defer to the district court's assessment of the sentencing-hearing testimony where other evidence does not unequivocally controvert that assessment); *see also, c.f., United States v. Oliver*, 278 F.3d 1035, 1043 (10th Cir. 2001) (stating "it is solely within the province of the jury[] to weigh . . . expert testimony") (quotations omitted).

The same is true for Wyrick's argument that he is entitled to a downward variance based on his delusional disorder.  The district court considered his mental illness but concluded a downward variance on that basis was unwarranted because his behavior "was no less serious as a result and is no less likely to happen again."  (R. Vol. 2 at 285.) And the court reasoned that although the need for just punishment (one of the § 3553(a) factors) may be lower for someone with a mental illness, the need to protect the public (also a § 3553(a) factor) may be greater.

Wyrick is correct that § 994(k) provides that the Sentencing Commission "shall insure that the guidelines reflect the inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant or providing [him] with needed educational or vocational training, medical care, or other correctional treatment." However, § 994(k), along with 18 U.S.C. § 3582(a),[10] merely "clarify that it is

---

[10] 18 U.S.C. § 3582(a) provides in relevant part:

The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and

inappropriate to impose a sentence to a term of imprisonment *solely for* rehabilitative purposes or correctional treatment." *United States v. Tsosie*, 376 F.3d 1210, 1215 (10th Cir. 2004) (emphasis in original omitted, new emphasis added). Here, the court did not impose a prison sentence solely to allow Wyrick to receive treatment. Rather, it is apparent that the court mentioned Wyrick's ability to receive treatment while in prison in response to Wyrick's argument that a term of probation was appropriate as it would allow him to obtain treatment for his mental illness. Even assuming the court did consider his ability to receive treatment in prison in deciding a term of imprisonment was appropriate, it clearly was not the only factor. Wyrick's claim that his need for treatment did not justify a prison sentence because he could be treated while released in the community is strained because he never sought treatment for his disorder while on pretrial release. It does, however, reflect a common theme running throughout these proceedings— Wyrick's refusal to take responsibility for his actions and his attempt to shift the blame elsewhere.

It is clear from the sentencing transcript that the district court took pains to arrive at a just sentence, one that was "sufficient but not greater than necessary to carry out Congress' objectives for sentencing embodied in the [§] 3553 factors." (R. Vol. 2 at 288.) It acknowledged Wyrick's arguments but reasonably found them unconvincing given the facts of the case. We discern no abuse of discretion in the imposition of a 37-month sentence.

---

rehabilitation.

**AFFIRMED.**

       **Entered by the Court:**

       **Terrence L. O'Brien**
       United States Circuit Judge