**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

DALE ILGEN,

     Defendant - Appellant.

No. 10-1116
(D.C. No. 1:08-CR-00258-JLK-1)
(D. Colo.)

---

### ORDER AND JUDGMENT[*]

---

Before **BRISCOE**, Chief Circuit Judge, **EBEL**, and **O'BRIEN**, Circuit Judges.

Dale Ilgen pled guilty to possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). He was sentenced to 78 months imprisonment, the bottom of the guideline range. He appeals from that sentence, claiming it is substantively unreasonable. We affirm.

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id.*

# I.  FACTUAL BACKGROUND

On July 31, 2007, a federal agent, using a computer program called Limewire,[1] discovered a file available for download containing the text "shx kid" (which is text known to be associated with child pornography) on a computer assigned the Internet Protocol (IP) address of 75.166.30.3.  Upon further investigation, he learned the computer had 489 files with filenames describing child pornography available for download.  He downloaded eleven of these files; ten of them contained child pornography.  He eventually traced the IP address to Ilgen and his residence in Parker, Colorado.

On December 19, 2007, agents executed a search warrant at Ilgen's residence.  They seized a computer containing 1,627 images and twenty-three videos of child pornography.  Some of the images show prepubescent children being sexually penetrated (orally, anally and vaginally) by adults; other images depict a nude prepubescent female tied and bound.  The images and videos were sent to the National Center for Missing and Exploited Children, which identified 324 images and four videos as being from a "known" series, *i.e.*, child pornography in which the victim has been identified.

Agents interviewed Ilgen on the day they executed the search warrant.  In his plea agreement, he admitted he made the following statements to the agents: (1) he owned the computer; (2) he lived alone and was the only one who had access to the computer; (3) he had made files available for sharing and understood others could access these files; (4) he

---

[1] Limewire is a software program which allows a computer to directly connect to other computers and access files on them.

used the Internet, in particular Limewire, to search for, access and download child pornography; and (5) he had approximately 1,000 pictures and ten videos of child pornography on his computer the day it was seized. According to the agents' notes, Ilgen also told them he had purchased a membership to a child pornography website at $9.99 per month in June or July 2007. He said he downloaded material from that site on to his computer and sometimes placed it on a compact disc (CD). He had also subscribed to another child pornography website in March 2007 at $29.99 per month; he cancelled that membership in June or July 2007. He stated he viewed both male and female pornography but preferred viewing females between the ages of 4 and 25.

Ilgen was arrested on June 19, 2008. In his post-arrest interview, he again explained he used Limewire to download child pornography. While he initially used it to download music, he eventually searched for "teenage girls" and child pornography "came up." (R. Vol. 4 at 18.) He admitted he had about 1,000 images and ten videos of child pornography on his computer when it was seized and he was aware these items were accessible to others using Limewire. He also said the youngest victims in his collection of child pornography were "around 4 to 5 years of age." (*Id.* at 19.) He described the period during which he was downloading child pornography as the "deepest darkest hole" he had ever been in and he would "not go back to that hole again." (*Id.* at 18.) He said he was not sure why he downloaded such a large amount of child pornography as it was not a fantasy for him. He admitted, however, to masturbating while looking at child pornography.

A week later Ilgen was released on bond under the supervision of Pretrial

Services.  Among other conditions, Ilgen was ordered to (1) participate in a home detention electronic monitoring program, (2) not access or subscribe to the Internet, (3) not possess or view child pornography, and (4) have no unsupervised contact with minors, including his minor daughter.  He complied with all conditions.

## II. PROCEDURAL BACKGROUND

A.      Indictment and Plea

Ilgen was indicted with transporting (Count 1), distributing (Count 2) and possessing (Count 3) child pornography.  He entered into a plea agreement with the government, agreeing to plead guilty to Count 3 in exchange for the government's dismissal of the remaining counts.

The district court accepted Ilgen's guilty plea.  During the change of plea hearing, however, Ilgen displayed a noticeable tremor.  The court called it to the attention of the attorneys and informed them it wanted a complete understanding of it prior to sentencing. It said it was "not going to send a debilitated individual to the mercies of the Bureau of Prisons" and wanted the parties to look into alternatives to prison.  (R. Vol. 2 at 20.)  The court referred the parties to its previous decision in *United States v. Rausch*, wherein the court sentenced the defendant (also charged with possession of child pornography) to home confinement because he needed a kidney transplant and it did not feel he would receive one if imprisoned.  570 F. Supp. 2d 1295 (D. Colo. 2008).  The court also expressed that it would not act as a mere "rubber stamp" of the guidelines: "I don't frankly give a goddamn what the Guidelines say because they treat—all cats are black as far as they're concerned.  There aren't any gray ones. . . .  [They have] turned human

- 4 -

judgment into a mechanical judgment . . . .  I won't do it."  (R. Vol. 2 at 22-23.)

B.      Ilgen's Mental Evaluations

Ilgen began therapy with Craig David Lounsbrough, a licensed professional counselor, in July 2008.  Lounsbrough diagnosed Ilgen with anxiety and depression.  He opined:

> [F]rom a clinical perspective[,] incarceration would clearly not appear in the patient's best interest and would likely not provide [him] the appropriate resources that he appears to require in order to deal with the above listed diagnostic issues.  Additionally, such a course of action would likely not serve society and the larger public as the testing data indicates that the patient does not present as a threat nor do his diagnostic issues suggest the likelihood of any future threat.  Finally, given the severity of the patient's diagnostic issues, incarceration will likely result in exacerbation of the patient's depression and anxiety, potentially creating major mental health issues for the patient.

(R. Vol. 1 at 76.)

In May 2009, Ilgen underwent a psychiatric evaluation conducted by Dr. Karen Fukutaki.  Ilgen told Fukutaki he began using Limewire to download music but typed "adult porn" into the search engine because he was "just curious."  (R. Vol. I at 65.)  He said that led to him downloading child and adult pornography but "[i]t was [a] game to see if I could download more than someone else . . . ."  (*Id.*)  When asked whether he viewed the child pornography, he said he saw only one or two images.  He said the images disturbed him and he was outraged that anyone could have produced such material.  He denied being sexually stimulated by the child pornography and knowing it was illegal to download and share child pornography.  Noting that these statements conflicted with his previous statements to the agents, Fukutaki reported: "[I]t . . . appears

he minimized his behavior in his report to me." (*Id.* at 71.) In the end, Fukutaki diagnosed Ilgen with depression which, combined with Ilgen's low self-esteem and social isolation, "probably contributed to his making a poor choice to download child pornography." (*Id.*) She said he would benefit from treatment.

While Lounsbrough had opined that Ilgen was not a threat to the public or predisposed to harming children, the government was concerned with this opinion because Lounsbrough was not an evaluator approved by the Colorado Sex Offender Management Board (SOMB) and had not utilized testing designed to evaluate sexual deviancy. Therefore, the government filed a motion requesting Ilgen be ordered to undergo a sex offense-specific evaluation by an SOMB-approved evaluator. The court granted the motion.

Ilgen underwent that evaluation with John Davis, who heard a similar story as that told to Fukutaki. When asked to explain the contradictory statements he made to the agents, Ilgen claimed he had told them he had viewed and subscribed to adult pornography websites. He also denied ever masturbating while viewing child pornography. Nevertheless, he was sorry for downloading child pornography and making it available to others. He did not believe he needed treatment in relation to his offense and claimed he would never do it again.

After performing a number of tests, Davis determined Ilgen's risk of sexual reoffense was "low to low moderate." (R. Vol. 5 at 116.) But the risk assessment was made "without objective verification of self-reported sexual history information . . . ." (*Id.* at 114.)

C.    Ilgen's Physical Condition

Ilgen has a history of a tremor.  In July 2008, he began seeing Dr. John Willard for anxiety, depression and an increase in his tremor.  Willard opined Ilgen would "have an extremely difficult time" in prison and prison would detrimentally affect Ilgen's physical and mental well-being.  (R. Vol. I at 117.)

Willard referred Ilgen to Dr. Jeff Tam Sing, a neurologist, concerning the tremor. Because Sing found no medical reason for the tremor, he diagnosed Ilgen with conversion disorder, a kind of hysterical neurosis in which emotional conflicts are repressed and converted into symptoms of illness.

D.    Presentence Report

A Presentence Report (PSR) was prepared.  The probation officer determined the base offense level was 18.  *See* USSG §2G2.2(a)(1).  She recommended the base offense level be enhanced by (1) two levels because the offense involved images of prepubescent minors who had not attained the age of 12, *see* USSG §2G2.2(b)(2); (2) four levels because the offense involved material portraying sadistic or masochistic conduct or other depictions of violence, *see* USSG §2G2.2(b)(4); (3) two levels because the offense involved the use of a computer, *see* USSG §2G2.2(b)(6) and (4) five levels because the offense involved 600 or more images, *see* USSG §2G2.2(b)(7)(D).  These enhancements resulted in an adjusted offense level of 31.  After applying a three-level downward adjustment for acceptance of responsibility, the total offense level was 28.  Because Ilgen had no criminal history, his Criminal History Category was I.  Based on a total offense level of 28 and a Criminal History Category of I, the probation officer determined the

advisory guideline range was 78 to 97 months imprisonment.

Attached to the PSR were (1) letters of support from Ilgen's parents, his sister and two uncles, several members of his church,[2] and a personal friend, as well as Ilgen's own statement; (2) Victim Impact Statements (VIS) from several of the victims portrayed in the pornography found in Ilgen's possession and their families;[3] and (3) reports from Lounsbrough, Fukutaki, Davis, Willard and Sing outlining their findings and opinions.

E.     Ilgen's Objections to the PSR and Motion for Downward Variance

Ilgen objected to the PSR. Relevant here, he denied telling the arresting agents that he had purchased memberships to <u>child</u> pornography websites; he claimed he told them he had subscribed to <u>adult</u> pornography websites. He also denied telling them he had masturbated while viewing child pornography.

Ilgen also filed a motion for a downward variance to probation under 18 U.S.C. § 3553(a).[4] He said a variance from the advisory guideline range was warranted because that range resulted from USSG §2G2.2, which Ilgen argued was not entitled to deference because it was not the product of empirical study and expert analysis by the United States Sentencing Commission but rather "Congressional hysteria." (R. Vol. 1 at 49.) He also

---

[2] Ilgen's pastor also testified on his behalf at sentencing, explaining the progress he had made in his counseling sessions with her and his volunteer work at the church.

[3] The VIS were obtained from the Child Exploitation and Obscenity Section of the Executive Office of the United States Attorneys, which is a national repository for VIS from known victims.

[4] Ilgen also filed a motion for a downward departure under USSG §§5K2.13 and 5H1.3, based on his diminished capacity and mental health as reported by Lounsbrough and Fukutaki. The court denied the motion; Ilgen has not appealed from that denial.

maintained a downward variance to probation was appropriate under the § 3353(a) factors.

> With regard to the nature and circumstances of the offense, Ilgen said:
>
> > For at least one year and possibly longer, [Ilgen], in the privacy of his small condominium, used a single computer to download[] child pornography. He never chatted with anyone on the internet regarding the images he possessed, never used the material to entice a child, nor did he produce, distribute, or trade any of the images. Mr. Ilgen has never had inappropriate contact with a child.

(R. Vol. I at 54-55.) As to the history and characteristics of the defendant, he emphasized he was a doting father, had worked for thirty years at the same company (until he lost his job due to his arrest) and had no criminal history. He also pointed to the fact he suffers from a tremor that worsens with stress and Dr. Willard's concern that incarceration would negatively affect his health and well-being.

Finally, Ilgen argued a sentence of probation would satisfy the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law and to provide just punishment, afford adequate deterrence and protect the public. He emphasized that "[p]robation is not a free ride;" probationers are required to follow special conditions, conditions he is already required to follow and to which he has complied. (R. Vol. I at 57.) He also pointed to his strong support network which included his family, his therapists and the members of his church. Ilgen further claimed he was not a threat to the public as there was no evidence he is psychologically predisposed to harming a child.[5]

---

[5] Ilgen supplemented his motion for a variance with an affidavit from Phillip Wise,

F.    Government's Response to Ilgen's Motion for Downward Variance

The government opposed Ilgen's motion for a variance and requested a sentence within the guideline range.  It said Congress conducted extensive research and involved the Sentencing Commission when it fashioned §2G2.2.  The government also argued the § 3553(a) factors did not warrant a variance.  Ilgen's offense involved a large number of photographs and videos which depicted prepubescent children being sexually penetrated by adults and tied and bound; he also made these items available to others.  And despite Ilgen's attempts to characterize his offense as "victimless," it was far from it.  (R. Vol. 1 at 138.)  Indeed, he had 324 images and four videos with known victims.  The VIS demonstrate the horror of the victims' abuse and the pain they and their families continue to suffer due in large part to the fact the abuse continues to be viewed by individuals, like Ilgen, for their own personal gratification.

As to the history and characteristics of the defendant, the government argued there was no medical cause for Ilgen's tremor and therefore no apparent treatment for it.  While Ilgen claims to have suffered from the tremor prior to his arrest, he never sought treatment for it and it did not appear to have impacted his ability to work or to perform

---

former Assistant Director of the Federal Bureau of Prisons (BOP).  Wise opined: (1) because Ilgen's anti-anxiety and anti-depression medications are not available through the BOP's national formulary of approved prescriptions medications, they will likely be changed or discontinued while he is in prison; (2) due to the nature of Ilgen's offense, it is likely he will be vulnerable to threats from other inmates; and (3) the common stressors of incarceration—such as disturbed sleep, noise, crowding and interaction with more aggressive inmates—may exacerbate Ilgen's mental and physical impairments.  The government rebutted these opinions at sentencing with the testimony of Shon Michael Kuta, a twenty-one year veteran of the BOP.

daily tasks. And there was no evidence the tremor had become debilitating or otherwise affected his ability to function; its worsening was obviously due to stress from this case. The government also claimed Ilgen's depression and anxiety should not preclude a sentence of imprisonment. These conditions did not arise until after execution of the search warrant at his residence. Therefore, they did not appear to be chronic but rather rationally related to his arrest and conviction.

According to the government, a sentence of probation would undermine the seriousness of the offense, especially given Ilgen's failure to accept full responsibility for his actions or the impact they have had on others; indeed, he had retracted the confession he made to the agents. This lack of insight places the community at risk and requires incarceration. Moreover, a sentence of probation would not act as a deterrent—the lighter the punishment for possessing child pornography, the greater the customer demand for it, which in turn leads to more being produced.

G. Sentencing

The district court overruled Ilgen's objections to the PSR. It then turned to the PSR's guideline calculations. It said the child pornography guidelines "are in a deplorable state." (R. Vol. 3 at 115.) It also criticized the guidelines in general for failing to consider each defendant separately and turning the sentencing process into a "mechanistic exercise" of trying "to pound square pegs into round holes." (*Id.* at 116.) Nevertheless, the court determined the guideline range, which had been properly calculated in the PSR, provided for a just sentence in this case. Therefore, the court denied Ilgen's motion for a downward variance.

The court then analyzed the § 3553(a) factors. It determined the nature and circumstances of the offense required a severe sentence: "[T]his is a horrible crime, many, many victims, most of whom are never going to appear in court but are going to carry with them the dehumanization that this kind of perversion has inflicted upon them." (R. Vol. 3 at 117.) As to the history and characteristics of the defendant, the court said Ilgen needed treatment for a significant period of time and that treatment could be provided by the prison. The court also determined a severe sentence was necessary in order for the sentence to reflect the seriousness of the offense. It pointed to the fact the offense conduct (1) had continued over a period time[6] and (2) involved participation and distribution, not just voyeurism or passivity. While the court was not persuaded that punishment had any deterrent effect on others, it did believe it had a deterrent effect on the defendant being sentenced—at least for the period of time they are in prison.

In the end, the court sentenced Ilgen to 78 months imprisonment, the bottom of the guideline range. In closing, it made the following remarks:

> Mr. Ilgen has stated in a letter to me that he now recognizes the wrongs he has done and that he has learned a valuable lesson, that he has already been deprived of opportunities to share basic and fundamental human experiences with his family and that he will never again commit the crime for which he has been convicted because he values those experiences so highly and . . . does not want to continue losing them.
>
> I accept this representation. And I hope that Mr. Ilgen never again engages in this despicable behavior.

---

[6] In its allocution at sentencing, the government noted agents had found a stack of CDs containing child pornography in Ilgen's living room. Two of the CDs were created as early as November 2003 and February 2004; two other CDs were created in 2005.

I am up to a point willing to grant that under more favorable circumstances, it is highly unlikely that he would ever have come before a court as a convicted criminal. I am willing to a point to grant that he is not a hard-core criminal who is usually indifferent to the plights and sufferings of others. For the sake of argument, I will assume that it was nothing more than misfortune that made him a willing participant in the moral muck of child pornography.

There still remains the unalterable fact that he carried out and actively supported an illegal industry that treats children like so much garbage, and it is not a nursery that our society is willing to accept. Just as Mr. Ilgen supported and carried out the policy and practice of victimizing children for perverted satisfaction, I will support and carry out society's strong determination that he does not deserve to be free to live among us without paying the price for his criminal conduct.

This is the . . . determinative reason . . . why I am sentencing Mr. Ilgen to prison.

(R. Vol. 3 at 124-25.)

### III. STANDARD OF REVIEW

We review sentences for reasonableness. *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1214 (10th Cir. 2008). Reasonableness review consists of both a procedural and a substantive component. *Id.* "The procedural component focuses on the manner in which the sentence was calculated, and the substantive component concerns the length of the sentence actually imposed." *United States v. Masek*, 588 F.3d 1283, 1290 (10th Cir. 2009) (quotations omitted). Ilgen does not dispute the procedural reasonableness of his sentence; his claim is limited to substantive reasonableness.

"We review sentences for substantive reasonableness under an abuse-of-discretion standard." *United States v. Middagh*, 594 F.3d 1291, 1294 (10th Cir. 2010). "A district court abuses its discretion when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Muñoz-Nava*, 524 F.3d 1137,

- 13 -

1146 (10th Cir. 2008) (quotations omitted).  We must determine "whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)."  *Alapizco-Valenzuela*, 546 F.3d at 1215 (quotations omitted).  In doing so, "[w]e may not examine the weight a district court assigns to various § 3553(a) factors, and its ultimate assessment of the balance between them, as a legal conclusion to be reviewed de novo.  Instead, we must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the [sentence imposed]."  *United States v. Smart*, 518 F.3d 800, 808 (10th Cir. 2008) (quotations omitted).

## IV. DISCUSSION

Ilgen complains his sentence is substantively unreasonable for several reasons. First, he says the court's determinative reason for the sentence—society's determination that child pornography crimes require severe punishment—would apply equally to any person convicted of a child pornography offense.  Therefore, the sentence does not reflect an individualized sentencing process as required by § 3553(a) and precedent.  *See Gall v. United States*, 552 U.S. 38, 50 (2007) (stating sentencing courts may not presume the guideline range is reasonable but rather "must make an individualized assessment based on the facts presented").  Moreover, the question is not <u>whether</u> society has determined punishment is necessary but rather <u>what</u> punishment is appropriate.  He contends a lower prison sentence or probation would have severely punished him for his first and only offense.

This argument is belied by the record, which clearly shows the court imposed a

sentence that it believed was appropriate under the circumstances of this case. The court ensured it had a full understanding of Ilgen's tremor. It was also well aware of his psychological problems and his representation that he would not reoffend. It further acknowledged it had read the numerous letters in support of Ilgen, as well as the reports from his doctors and evaluators. But individualized sentencing does not mean looking only to mitigating factors; it also requires consideration of aggravating factors, including the offense conduct. Here, the court did so and reasonably emphasized its very serious nature. Ilgen had a large number of images and videos of child pornography downloaded on his computer; some of these images and videos depicted horrid sexual abuse of very young children.[7] He also made these images and videos available to others. The court noted the long-term damage of Ilgen's conduct to the victims. As one victim said in her VIS: "When I was told how many people had viewed these images and videos, I thought my pulse would stop. Thinking about all those sick perverts viewing my body being ravished and hurt like that makes me feel like I was raped by each and every one of them." (R. Vol. 5 at 48.)

Ilgen also objects to the court's treatment of the guidelines. At the change of plea hearing and at sentencing, the court criticized the guidelines, in particular, § 2G2.2. Yet, the court sentenced Ilgen within the guideline range. He says "[t]he court's simultaneous disdain for and adherence to . . . §2G2.2 does not provide a reasonable basis for [the]

---

[7] The government described in detail some of the images and videos at sentencing. The PSR and VIS provide other details. We need not repeat these descriptions here. Suffice to say, the images and videos are appalling.

sentence imposed by the court."[8]  (Appellant's Opening Br. at 36.)  We disagree.

The court's criticisms of the guidelines demonstrate its recognition that it was not bound to follow them.  That being so, the fact it nevertheless sentenced Ilgen within the guideline range reflects its belief that the sentence resulting from the guidelines was appropriate under the circumstances of the case.  In fact, as the court informed the parties, it had previously rejected the guideline range in two child pornography cases.  But it also distinguished those cases, saying it varied in those cases "primarily because of the [need for the defendant to receive] constant medical care."  (R. Vol. 3 at 115.)  Specifically, as to *Rausch*, the court said it involved "exigent circumstances" and neither party "should draw any conclusion from it that . . . the same sentence would be imposed in other cases." (*Id.* at 116.)  Obviously, the court did not find exigent circumstances here, especially given there was no medical cause or treatment for Ilgen's tremor.

Ilgen also says his sentence is unreasonable because the district court may have erroneously limited its sentencing discretion to choosing between a guideline sentence

---

[8] In the district court, Ilgen set forth extensive argument as to why §2G2.2 is not entitled to deference based on the fact it was enacted without the empirical analysis of the Sentencing Commission.  He does not repeat those arguments on appeal, other than to say §2G2.2 is suspect and a number of courts have imposed below-guideline sentences in child pornography cases as a result.  He also has submitted a Rule 28(j) letter referring us to *United States v. Regan*, where the defendant raised a similar argument which we determined to be "quite forceful."  627 F.3d 1348, 1353-54 (10th Cir. 2010).

Assuming he has sufficiently raised the issue, we do not find it persuasive.  The district court was obviously aware of Ilgen's argument and indeed acknowledged the "deplorable state" of §2G2.2.  (R. Vol. 3 at 115.)  But it also obviously believed that application of that guideline resulted in a just sentence under the circumstances of the case.  And, as we explain below, the fact the court could have varied downward based on its disagreement with §2G2.2 does not mean it was required to do so.

and probation (the sentence he requested in the district court). While the court said a below guideline sentence was not appropriate, Ilgen says it is unclear (given other comments by the court) whether it was referring to all below-guideline sentences or merely probation. We see no error. As Ilgen acknowledges, the court said a "below the Guideline statutory sentence [was] not appropriate" in this case. (R. Vol. 3 at 116.) That obviously means all below-guideline sentences, not just probation, and we decline to infer a more limited meaning. While the court made certain comments regarding why a prison sentence was appropriate, they were obviously made in response to Ilgen's argument for a sentence of probation.

Finally, Ilgen claims the district court did not reasonably balance the § 3553(a) factors.[9] While it determined he needed treatment and could receive that treatment in prison, it also acknowledged Ilgen had made progress in treatment while on home detention. As to the deterrent effect, Ilgen says he was not in need of deterrence—he was 53-years-old at the time of sentencing, had no criminal record and the court accepted his statement that he would not reoffend. But, in any event, deterrence certainly did not support the lengthy sentence imposed. Ilgen also claims his 78-month sentence creates an unwarranted disparity, as the trend in Colorado, as well as nationally, is for a below-

[9] In Ilgen's opening brief, the only § 3553(a) factor he addresses in argument is the court's duty to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See* § 3553(a)(6). While he discusses the other factors, he does so only in setting forth the arguments the parties raised in the district court; he does not appear to be raising them as arguments on appeal. In his reply brief, however, he argues the court did not reasonably balance the § 3553(a) factors. While we do not believe he sufficiently raised them in his opening brief, we nevertheless address them.

guideline sentence in child pornography cases. Indeed, according to Ilgen, there are a growing number of cases where probation is being imposed. He says this trend demonstrates that the guideline ranges in child pornography cases often result in a sentence greater than necessary under § 3553(a).[10]

Ilgen has a tough row to hoe. Because he was sentenced within the advisory guideline range, the sentence is entitled to a presumption of reasonableness. *See United States v. Lewis*, 594 F.3d 1270, 1277 (10th Cir.), *cert. denied*, 130 S. Ct. 3441 ( 2010). Little need be said. While Ilgen can rebut that presumption by showing his sentence is unreasonable in light of the § 3553(a) factors, *id.*, he has failed to do so.

The district court's consideration of the § 3553(a) factors primarily focused on the serious nature of the crime. "But a reasonable sentencing judge need not give equal weight to all factors. The heinous nature of the offense in itself can justify a harsh sentence." *Id.* In any event, the court also considered the other factors, including the history and characteristics of the defendant and the need for the sentence imposed to afford adequate deterrence. Ilgen criticizes the court's balancing of these factors but we see no abuse of discretion.

The fact Ilgen made progress while on home detention does not necessarily justify a lower prison sentence, especially when the court has determined he can continue to receive treatment while in prison. Ilgen's claim he is not in need of deterrence has some

---

[10] This argument is in direct conflict with Ilgen's claim that his sentence does not reflect an individualized sentencing process—on the one hand, he seeks a sentence tailored to his individual circumstances; on the other hand, he wants a sentence following the "trend," without regard to the unique circumstances of this case.

support in the record, in particular his lack of criminal record and Davis' opinion that Ilgen's risk of sexual reoffense is "low to low moderate." (R. Vol. 5 at 116.) On the other hand, it also appears Ilgen's criminal behavior was not new as he had been possessing child pornography since 2003, four years before he got caught. *See supra* n.6. Moreover, Davis' risk assessment is suspect because it was based in part on Ilgen's self-report, which included his statements that he had not subscribed to child pornography websites and had not masturbated to child pornography. These statements are in direct conflict with his earlier statements to the agents.

The district court did not explicitly discuss "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See* 28 U.S.C. § 3553(a)(6). However, while the court must state its reasons for imposing a certain sentence so as to allow for adequate appellate review, it need not expressly weigh on the record each of the § 3553(a) factors.[11] *See United States v. Jarrillo-Luna*, 478 F.3d 1226, 1229 (10th Cir. 2007); *see also United States v. Verdin-Garcia*, 516 F.3d 884, 898 (10th Cir. 2008) ("[A] district court need not march through § 3553(a)'s sentencing factors, nor do we demand that the district court recite any magic words to show that it fulfilled its responsibility to be mindful of the factors that Congress has instructed it to consider.") (quotations omitted). In any event, the fact other defendants charged with possession of child pornography have received below-guideline sentences (or even probation) is not necessarily relevant to determining the appropriate

---

[11] Moreover, this is a procedural reasonableness argument and Ilgen has limited his appeal to a substantive reasonableness challenge. *See Gall*, 552 U.S. at 51.

sentence in this case, especially given Ilgen's failure to describe the circumstances of those cases to allow for adequate comparison. To the extent this is an argument that §2G2.2 is not entitled to deference because it often results in too harsh a sentence, the court was obviously aware of that argument. But merely because a court <u>may</u> vary based on its belief §2G2.2 results in too harsh a sentence does not mean it is <u>required</u> to do so. *C.f. Lewis*, 625 F.3d at 1232 ("Our court has recognized, consistent with Supreme Court precedent, that district courts may permissibly depart or vary downward from the crack guidelines, but they are not required to do so."), *petition for cert. filed*, No. 10-8606 (January 24, 2011). And while a court may vary from a guideline based on a disagreement with a policy decision of the Sentencing Commission, it should do so on a case-by-case basis, not merely because other courts have done so in other cases. *See Pepper v. United States*, -- U.S.--, 131 S. Ct. 1229, 1255 (2011) (Breyer, J., concurring) ("The appellate courts should review . . . decisions [to depart or vary from a specific guideline] more closely when they rest upon disagreement with Guidelines policy. They should review those decisions with greater deference when they rest upon case-specific circumstances that place the case outside a specific Guideline's 'heartland.'") (citation omitted).

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge